## Case No. 14,363.

### The UNION EXPRESS.

[1 Brown, Adm. 516.] [1]

District Court. E. D. Michigan. Sept., 1874.

SALVAGE—CONTRACT WITH OWNER OF CARGO.

Where a barge without small boat, provisions, sails or other means of propulsion, was adrift upon Lake St. Clair, although she had come to anchor, and the weather was good, *held*, that she was in a situation to have salvage services rendered her, but that an adjustment of the same made by the owner of the cargo, was not binding upon the vessel.

[Cited in Maltby v. Steam Derrick Boat, Case No. 9,000; Cope v. Vallette Dry-Dock Co., 16 Fed. 926.]

This was a libel in rem by Alexander Tregent, owner of the tug Gem, for towage and salvage services, on the nights of June 17th and 18th, 1873. On the 17th of June the barge took on a cargo of 250 cords of slabs at Belle river, on Lake St. Clair, in the province of Ontario, for transportation to Sandwich, on Detroit river, in the same province, for one John Holgate. She had no sails or other means of propulsion of her own, and no small boat. After taking on her cargo, she broke loose from her moorings, and, with her crew on board, drifted out into the lake, what distance from shore did not appear, and finally came to anchor in about twelve feet water. The slabs constituting the cargo belonged to one Mather, but Holgate, in whose name they were shipped, held a contract, in writing, by which Mather agreed to sell them to him for six shillings per cord, but to remain the property of Mather until paid for. After the barge had gone adrift, and in the afternoon of the same day, Holgate, not then knowing the whereabouts or situation of the barge, except that she had gone adrift with her cargo on board, applied to libellant to send his tug Gem to her rescue, and bring her and cargo into Detroit, which libellant consented to do; and it was then agreed that the compensation for that service should be at the rate of $7 per hour for the time necessarily spent, and that libellant should look to the cargo and barge for his security. The tug left Detroit on that service the same evening, and returned to Detroit with the barge and cargo between five and six o'clock the next morning. At just what hour the tug left Detroit did not clearly appear. All that appears is that it was "after tea." which would make the time of leaving probably six, or between six and seven o'clock. Although the night was dark, the tug had no difficulty in finding the barge; and after lying by her one or two hours, to give the men on her time to prepare and take supper from provisions furnished them from the tug, the barge having no provisions on board, she took the barge's line and proceeded at once to Detroit. When the tug came up to the barge, her master, Moses Robarsh, who was also equitable owner, then on board of her, said to the master of the tug, he was glad he had come for them, and on being informed that the tug was at work by the hour, at once passed his line to the tug, and as soon as the men were ready, the journey to Detroit was at once commenced and carried to the end without further trouble or delay. It did not appear that Robarsh was informed of the rate of compensation agreed on, but only that the tug was at work by the hour. Mather, the legal owner of the cargo, was with Holgate when the bargain for the tug was made, but whether he took any part in it or not did not appear; but it did appear that he was informed and knew of the terms agreed on. After the barge was brought to Detroit, and on the same day, Holgate gave to the master of the tug an order or draft on John Pridgeon, to whom the cargo was soon after transferred, for $98, being for 14 hours' services at $7 per hour, but payment was refused. Before this writ was brought, both vessel and cargo had been transferred to the said John Pridgeon, and he is the claimant in, and is defending this suit. There was some testimony tending to show that Holgate was intoxicated so as to be incapacitated to do business when he made the bargain with libellant for the use of the tug, but not at the time he gave the order on Pridgeon. Some further facts in the case will appear in the opinion of the court.

H. H. Swan and J. W. Finney, for libellant.

Alfred Russell and S. Larned, for respondent.

LONGYEAR, District Judge. The first question that will be considered is, whether the service rendered by the tug was a salvage service. I think the barge and cargo were in a situation to have a salvage service rendered for them. They were adrift and utterly helpless, and night was coming on; and, although the barge came to anchor, she was in danger of being broken by any storm which might come on; the men were without provisions, and they had no small boat or other means of escape to the shore. It is true, there was no particular peril to the tug or her crew, nor any special difficulty or enterprise in the undertaking; but those considerations do not necessarily determine the character of the service as a salvage service or not; they bear more directly upon the quantum or measure of compensation to be allowed, where more has been agreed on. I hold, therefore, that, the service being a salvage service, libellant has a lien therefor on both vessel and cargo enforceable in this court, independent of any effect that might be given to the contract between libellant and Holgate.

It is not important or necessary to consider whether Holgate's agreement with libellant was valid or invalid, or whether, if valid, it bound both vessel and cargo, or cargo only

---

if either; because, as already seen, a lien exists upon both independently of it; and for the further reason that I am satisfied that $7 per hour, the rate of compensation agreed on; is a fair and reasonable compensation on a quantum meruit. All that remains, therefore, is to determine the number of hours for which libellant is entitled to compensation. It was concluded that the draft given by Holgate was evidence of a settlement and of an adjustment of the amount in controversy. While that is correct, it is equally true that it is prima facie only, and it is not even that as to the vessel, for Holgate was interested in the cargo only, and he had no power to bind the vessel in that manner. And, in addition, it appears by libellant's own testimony, that the data upon which Holgate made the adjustment were erroneous. He allowed the tug for 14 hours. The longest time that can be made by the testimony, is from 6 p. m. to 6 in the morning, which would be 12 hours. I think the most reasonable data, from the testimony, are 6½ p. m. to 5½ in the morning— eleven hours instead of fourteen as allowed by Holgate. The distance was only 18 or 19 miles, and notwithstanding the tug was obliged to run at a low rate of speed after she arrived in the vicinity where it might be expected the barge would be found, and also that she laid by the barge an hour or so waiting for the men to get supper, I think even eleven hours an unreasonable time. The only explanation of the extraordinary amount of time consumed is that, owing to some derangement of the tug's boiler, a sufficient amount of steam could not be made to enable her to make better time. But the time lost on that account must be held to be the loss of the tug, and therefore cannot be charged to the vessel and cargo, especially in the absence of all proof that the condition of the tug was known to the parties interested when she was engaged and her services accepted. I think nine hours a liberal allowance as to time, and libellant's recovery must be upon that basis.

9 hours' services at $7 per hour....... $63 00
Int. June 18, '73, to date, Sept. 14, '74, at 7 per cent.....................  5 48

Making a total of................ $68 48

For which amount libellant must have a decree, with costs. Decree for libellant.